## TREADWELL *v.* THE STATE.

99 779
f109 515

1. Though a merchant makes to a commercial agency a statement in some respects false, to be used in giving him a rating, which he knows is intended to be used by others as a basis for determining whether or not credit will be extended to him, yet where no credit is actually extended until after the lapse of a considerable period, such, for instance, as sixty days, the person extending the credit and parting with the possession of his goods in pursuance thereof cannot assume that the statement is still operative, unless the person credited expressly reaffirms the truth of the statement, or at least knows or has reason for believing that he is obtaining the credit on the faith of the representations made in the statement, and by remaining silent misleads the other party.

2. Under the evidence disclosed by the record, this case, upon its substantial merits, is disposed of by the ruling above announced; and therefore it is unnecessary to deal specifically with

the various questions presented in the motion for a new trial and bill of exceptions.

Argued December 14,—Decided December 17, 1896.

Accusation of cheating and defrauding. Before Judge Berry. Criminal court of Atlanta. October 13, 1896.

*M. Foote, Jr.,* and *Watkins & Dean,* for plaintiff in error. *James F. O'Neill, solicitor,* contra.

ATKINSON, Justice.

The defendant was indicted for the offense of being a common cheat and swindler. It was alleged, that upon a day named, he had procured R. G. Dun & Co., who were engaged in the conduct of a commercial agency, to make certain reports concerning his business connections and mercantile responsibility; that such reports were false; and that upon the faith and credit of such report he fraudulently induced the prosecutor to extend to him a credit, and by the means aforesaid fraudulently obtained possession and control of the personal goods of the prosecutor. Upon the trial he was convicted. He moved for a new trial upon the general grounds, and upon certain specified grounds, which, under the view we take of this case, it will not be necessary for us to consider; and his motion being overruled, he excepted.

The evidence introduced for the prosecution was, in substance, as follows. Charles D. Brady sworn for the State testified: On November 4th, 1895, by instruction of R. G. Dun & Co., he went out to see the firm of Morris & Treadwell; he met at the store E. W. Treadwell, the defendant in this case, and told him that he was with the firm of R. G. Dun & Co., a credit agency; that he had inquiries concerning them, and that he wanted a report from him as to the commercial standing of his firm. Whereupon Treadwell made a report which is hereinafter set out. He wrote this paper while standing in the defendant's presence, and at the time told him that it would be the report of Dun

& Co. as to his commercial standing. Afterwards he took
this memorandum and went back to the place of business of
his firm, and wrote out the report which his firm has on
record as to the commercial standing of the firm of Morris
& Treadwell. He was not instructed by the defendant to
make this report to any one. No one was referred to him
for the report. He did not go to Langston & Woodson,
or to Mr. Woodson, the prosecutor in this case. He made
up this report by the representations made him by the de-
fendant, up to the words "it is learned"; following the
words "it is learned," he got information elsewhere, and
also after making inquiries of others. For the past four
months he had been in the city of Baltimore in the employ
of R. G. Dun & Co. The report submitted to him is the
report he made out from what was told him by the defend-
ant, and also from what information he gathered by reason
of inquiries made from others.—W. D. Brady, sworn for
the State, testified: "I am the superintendent of the R. G.
Dun agency in the City of Atlanta, and Langston & Wood-
son are contributors and members of our association, which
membership entitles them to reports when they apply for
same, the agency being for the purpose of furnishing in-
formation as to commercial and financial standing of differ-
ent parties. I did not get the report in this prosecution
from the defendant; he did not instruct me to make the re-
port for him. No one was referred to me by him for this
report." J. J. Barnes, sworn for the State, testified: "I
am sheriff of Fulton county, and during the month of
March sold the stock of goods, horse and wagon of Morris
& Treadwell at 526 Marietta street, same under foreclosure
sale, mortgage personalty, Mrs. Treadwell *v.* Morris &
Treadwell, price realized $555.00. I did not sell the books
and accounts, as they were not included in the mortgage,
and there was no foreclosure as to that; and turned over the
money to Mr. Mord Foote, Jr., as the attorney of Mrs. M.
C. Treadwell." W. D. Woodson, sworn for the State, tes-

tified: "I am the credit man of Langston & Woodson, and up to January, 1896, had sold the firm of Morris & Treadwell several bills amounting to about $4.00 each, same sold on credit, regular terms. On November 4th, 1895, Morris & Treadwell applied, through our city salesman, for an enlarged extension of credit; before passing on the same, and in order to ascertain same, November 4th, 1895, I applied to Dun & Company agency, in writing, for a report as to the commercial standing of Morris & Treadwell. I was not referred to Dun agency by the defendant herein. I did not ask him as to the standing of his firm; he made no report to me, did not refer me to any one, and I had never seen defendant or his partner. I got from Dun & Co., on November 4th, 1895, a report as to the commercial standing of Morris & Treadwell. This is the report. [Hereinafter set out.] Based on this report I gave Morris & Treadwell a line of credit, and sent them goods on the dates as follows: January 7th, 10th and 30th; February 3d, 15th and 21st. Same sent out in January and February, 1896; and the goods amounted to $137.55, none of which have been paid for. Account has not been placed in suit. I based the line of credit on this entire report. I went out after the foreclosure of the mortgage and saw Treadwell, and presenting my account, asked him for payment, or to have it secured. He refused either payment or security or any satisfaction whatever." The following is a copy of the memorandum made by Chas. D. Brady in the presence of the accused:

| | |
|---|---:|
| Stock about.......................... | $1,200 |
| Accounts ........................... | 600 |
| Cash ............................... | |
| | $1,800 |
| Insurance ....................$600 | |
| Liabilities ....................O. K. | $   300 |
| | $1,500 |
| Stocks and bonds................... | |

Morris has no interest.    He stays around some, but has nothing in the business.      11, 4, '95.

The statement made by R. G. Dun & Co. to Langston & Woodson, dated November 4th, 1895, was as follows:

"Assets, stock of mdse. on hand $1,200. Good accounts $600.    Total $1,800.    Liabilities, owe for mdse. not due $300.    Surplus in business and net worth $1,500.

"It appears that Morris is practically an employee of Treadwell.    He was formerly in the retail grocery business at Rome, Ga., and has some experience.    Treadwell was also a resident of Rome, Ga., where he was employed as moulder prior to coming to Atlanta.    Started this business in Feby. of this year.    It is learned they have been buying from several houses in a small way, and are reported reasonably prompt in meeting obligations.    They are not considered very capable business men.    Limited credit, if any, considered advisable.    Rate L—"

It was shown, that at the time the statement was made, E. W. Treadwell and Ella L. Morris had outstanding an indebtedness represented in a due bill drawn by them February 9th, 1895, in favor of Mrs. Martha C. Treadwell, for $875.00, secured by a mortgage upon their stock of goods, delivery wagon and horse, which mortgage was recorded on March 2d, 1896.

There is other evidence in the record, submitted on behalf of the defendant, denying the making of the statement, and contradicting in other points the testimony adduced by the State; but as the jury found against him, in dealing with the question as to whether the verdict was contrary to law, we will leave out of consideration that testimony, and examine the case entirely in the light of the testimony introduced by the State.

1. The statute under which this defendant was indicted provides, "If any person, by false representation of his own respectability, wealth, or mercantile correspondence and connections, shall obtain a credit and thereby defraud any person or persons of any money, goods, chattels, or any

other valuable thing, or if any person shall cause or procure others to report falsely of his honesty, respectability, wealth or mercantile character, and by thus imposing upon the credulity of any person or persons, shall obtain a credit, and thereby fraudulently get into possession of goods, wares or merchandise, or any other valuable thing or things, such person so offending shall be deemed a cheat and swindler, etc." Code, §4587. The indictment in the present case is framed under the words of the statute, "or shall cause or procure others to report falsely of his honesty, respectability, wealth or mercantile character, and by thus imposing upon the credulity of any person, shall obtain a credit." While the testimony is by no means clear as to that point, for the purposes of this discussion we will assume that the accused did cause and procure the Dun commercial agency to represent falsely his respectability, wealth and mercantile character. To procure such a report to be made is not alone criminal. According to the language of the statute, that act must be supplemented by evidence that the accused, through the instrumentality of such report, himself overreached and imposed upon the credulity of the person who extended to him the credit. In order to charge him with imposition by such means, it must be shown that such report was employed by him as an active instrumentality in bringing about the imposition, and this necessarily involves proof that he knew, at the time the credit was extended to him, that it was being done upon the faith and strength of such report. While the evidence discloses that these reports were issued for a general purpose, and with a view of giving to the public, or to any persons who chanced to be clients of the mercantile agency, information touching the financial standing of different persons in the community, and that such reports are ordinarily employed by persons engaged in the mercantile business, for the purpose of determining to what extent other persons are entitled to credit, there is no evidence in the record, that at the time of

·this particular transaction the accused knew or suspected that the credit was being extended to him upon the faith and strength of his commercial rating thus established. He is presumed, in the first instance, to be innocent of fraudulent intent, and while it may be true, and is true under the evidence in the present case, that the credit was really extended to him upon the faith and strength of this report, there is no evidence that he referred to this report in order to induce the credit, or that the prosecutor was induced by him to part with his goods upon the faith and strength of this false token.    Had attention of the accused been called to this report by the seller, and he had thereupon affirmed the report, and thus fraudulently obtained goods, the imposition practiced might properly have been referred to it; or if the report had been made contemporaneously with the credit, and with the knowledge upon the part of the accused that the seller of the goods had referred to the person making the report for information, it might have been sufficient; but after the lapse of sixty days time, in view of the changes which are constantly occurring in the mercantile standing of parties, it would be manifestly unjust to impute to the accused a criminal design, at the time he made the report, to overreach and impose upon every person who might thereafter extend to him a credit.    It is barely possible that the accused may have had a criminal design; but to place upon this statute the broad construction contended for by the State, would practically turn the criminal courts into machines for the collection of debts, rather than for the punishment of those persons who wilfully violate a public law.

2. We are fully persuaded that the verdict was unsupported by the evidence, that the conviction was contrary to law; and a new trial is accordingly ordered.

*Judgment reversed.*